# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

ROSALINDA ORTA, SARAY MEDINA,
and URSEAL WARD,

        Plaintiff(s),

v.

SEIU HEALTHCARE MICHIGAN,

        Defendant.

_____/

CASE NUMBER: 10-15060
HONORABLE GERALD E. ROSEN

## OPINION AND ORDER REGARDING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This unfair labor practices case under 29 U.S.C. § 187 (LMRA § 303) and 29 U.S.C. § 158(b)(4) (NLRA § 8(b)(4)) is presently before the Court on Defendant SEIU Healthcare Michigan's Motion for Summary Judgment. Plaintiffs Rosalinda Orta, Saray Medina, and Urseal Ward have responded, and Defendant has replied. Having reviewed and considered the parties' briefs and supporting documents and the entire record of this matter, the Court has determined that the pertinent allegations and legal arguments are sufficiently addressed in these materials and that oral argument would not assist in the resolution of this motion. Accordingly, the Court will decide Defendant's motion on the briefs. *See* L.R. 7.1(f)(2). This Opinion and Order sets forth the Court's ruling.

1

## II. PERTINENT FACTS

### A.   The Parties

Plaintiffs, Rosalinda Orta, Saray Medina, and Urseal Ward are former employees of the Cassie Stern Healthcare Workers Education and Training Center ("CSC"), which was a non-profit training center for healthcare workers. Orta began work with CSC on March 3, 2008, as a Program Coordinator and was responsible for safety and security training. Medina was a Case Manager and commenced her employment on June 16, 2008. Ward was employed with CSC as a Job Development Coordinator and started on October 16, 2008. All Plaintiffs were terminated on June 23, 2010.

CSC's mission was to provide educational and charitable assistance to the public by training and educating individuals for healthcare jobs. As part of its mission, CSC partnered with Nexcare Health Systems ("Nexcare"), a major corporate operator of nursing homes and long term care facilities in Michigan. The partnership between Nexcare and CSC consisted of Nexcare paying approximately one-half of Orta's salary, and in return, two of Nexcare's employees were given seats on CSC's Board of Directors.

Anita Caref was the Executive Director of CSC from its inception in 2007 until she resigned on May 27, 2010. Caref's husband, Doyle O'Connor, a labor attorney and an administrative law judge, served as CSC's secretary and was also a member of CSC's Board of Directors.

Defendant, SEIU Healthcare Michigan ("SEIU HCMI"), is a labor organization representing approximately 55,000 healthcare workers in Michigan, including healthcare workers at seven Nexcare facilities. CSC was created with the help of, and on behalf of, SEIU HCMI. As a non-profit organization, CSC was funded primarily through various government and private grant programs. However, SEIU HCMI would occasionally transfer funds to CSC to cover short-term budget gaps when CSC would be between grant money.

Marge Faville is the president of SEIU HCMI. Faville also became the president of CSC upon Anita Caref's resignation as Executive Director. Thus, as of May 27, 2010, Faville maintained two positions concurrently: she was the President of SEIU HCMI, the Defendant; and the President of CSC, Plaintiffs' employer. Chuck Lobaito, SEIU HCMI's director of finance, is also CSC's treasurer. Mark Raleigh is SEIU HCMI's Chief of Staff.

**B.      The Nexcare and SEIU HCMI Dispute**

As indicated, Nexcare was a cooperating partner with CSC, and it owned the Nexcare Training Institute, a separate facility which provided Certified Nurse Assistant training to workers after they were screened and received initial training from CSC. In March 2010, Nexcare filed a Unit Clarification Petition with the National Labor Relations Board ("NLRB") seeking to exclude certain nurse supervisors from existing bargaining units with SEIU HCMI. Faville, as the President of SEIU HCMI, disagreed

3

with the petition because, if approved, the petition would have had the effect of excluding certain members from the union, thereby decreasing union membership.[1]

On April 29, 2010, Mark Raleigh, SEIU HCMI's Chief of Staff, met with CSC's Executive Director Anita Caref to inquire as to the extent of CSC's partnership with Nexcare. Raleigh informed Caref that SEIU HCMI was planning to strike Nexcare in retaliation for its NLRB petition. The parties provide different accounts of what was said during the meeting.

According to Caref, Raleigh told her that the relationship between Nexcare and SEIU HCMI would become heated; he "demanded" to see a list of transactions between CSC and Nexcare; and he "demanded" and "ordered" that CSC cease doing business and "sever all ties" with Nexcare because CSC would need to go along with SEIU HCMI's response to Nexcare's NLRB petition. *See* Plaintiffs' Response Brief, p. 4.[2] After the conversation with Raleigh, Caref consulted her husband, Doyle O'Connor, who advised

---

[1] With regard to Nexcare's NLRB petition, SEIU HCMI's Chief of Staff, Mark Raleigh stated that he was not "pleased" because the petition "had a real possibility of taking people out of the union." Raleigh Dep., p. 15.

[2] Defendant disputes that Raleigh requested Caref to sever all ties with CSC. Raleigh testified that he told Caref only that

> Nexcare had filed this petition, that…it could have the effect of taking a number of people out of the union in the one home and we were worried that it might spread to other homes and that we were upset that Nexcare had decided to do this and that, you know, the relationship between the union and Nexcare was going to be a little more heated for a while around this issue. And I asked her for a list of the transactions and work we did with the Nexcare Training Center and Cassie Stern.

Raleigh Dep., 19.

her against following through on Raleigh's request and told her CSC should remain a
neutral party.

On May 27, 2010, Caref resigned from CSC for reasons unrelated to this case, and
Marge Faville took her place as of that day. Faville continues to concurrently hold two
positions: that of SEIU HCMI president, and president of CSC.[3]

## C.      CSC Board of Directors Meeting

At a CSC Board Meeting held on June 22, 2010, in order to maintain a neutral
position in the dispute between Nexcare and SEIU HCMI, O'Connor proposed -- and the
CSC Board of Directors by a vote of 6-2, passed  over Faville's objections -- a neutrality
resolution. Also during the meeting, the Board voted to name one of the plaintiffs,
Rosalinda Orta, as Interim Coordinator to run CSC's daily affairs. CSC's treasurer,
Chuck Lobaito, also discussed CSC's finances during the meeting. Although Lobaito's
financial report concluded that CSC had long-term funding issues, no short-term
budgeting was discussed, nor was there any discussion of not meeting payroll or potential
lay-offs or terminations.  According to Doyle O'Connor, Lobaito merely reported that
CSC

> had long range funding issues, that we had to work harder to get more
> grants, but, basically, we were fine right now. It was a little tight. . . [The
> Board] knew that there was money, and we knew that it was tight. We
> knew that it wasn't enough to get us through the end of the year, but it was

---

[3] After Caref's resignation, Faville met with Plaintiffs to "reassure them and make sure
that everyday stuff is going to continue to go on." Faville Dep., p. 80. Faville also told
Plaintiffs that their jobs were secure. *Id.*  One of the Plaintiffs, Rosalinda Orta, recalls
that Faville also stated that "as long as SEIU is around, Cassie Stern will be okay . . . "
Orta Dep., pp. 47-48.

clearly not a crisis. It was, basically, we've got to hold our breath until . . .
[t]he next grant that was due.
[O'Connor Dep., pp. 168-69, 170.]

**D.    Plaintiffs' Terminations**

The following day, June 23, 2010, Lobaito learned that CSC did not have enough money to cover payroll.  On that same day, Faville ordered Lobaito to terminate Plaintiffs Orta, Medina, and Ward, the three individuals who represented CSC's entire full-time staff.  (Faville did not discuss Plaintiffs' terminations with the CSC Board.)  Plaintiffs contend that termination of CSC's full-time staff "killed" CSC.[4]  The next CSC Board meeting occurred on August 30, 2010. At that meeting, according to O'Connor, Faville continued to assert that Plaintiffs' terminations were due to financial reasons and that the union was going to have to "subsidize" CSC.  However, Faville was not "willing to do that [and]. . . she had [Lobaito] lay everybody off because of lack of funds." O'Connor Dep., p. 174. Subsequently, on October 10, 2010, CSC was automatically dissolved as a Michigan corporation due to its failure to file the requisite annual reports with the Secretary of State.

**E.    Litigation**

---

[4]  Defendant argues that after Plaintiffs' terminations, CSC continued its operations, including its relationship with Nexcare. On the other hand, Plaintiffs argue that the terminations "effectively shut down" CSC because scheduled courses did not occur and many students that were directly sent to Nexcare without going through the CSC courses "flunked out" due to lack of CSC's screening and preparation. *See* Plaintiffs' Response Brief, p. 9.

On December 21, 2010, Plaintiffs commenced this action alleging violations of the National Labor Relations Act ("NLRA") and Labor Management Relations Act ("LMRA"), 29 U.S.C. §§ 158(b)(4), 187. In addition, Plaintiffs' complaint alleged state law claims of retaliatory discharge and tortious interference with Plaintiffs' employment contracts.

In lieu of an answer, Defendant filed a FED. R. CIV. P. 12(b)(6) Motion to Dismiss. This Court denied the motion and ordered the parties to complete discovery. After the close of discovery, Defendant filed a FED. R. CIV. P. 56(a) Motion for Summary Judgment seeking entry of summary judgment in their favor on all counts, including Plaintiffs' two state claims for retaliatory discharge and tortious interference. With respect to these state law claims, Defendant argued that they are preempted by the Supreme Court's *Garmon* Doctrine [5] because state regulations and state causes of action are completely preempted if they concern conduct that is either prohibited or protected by the NLRA. In their response to Defendant's Motion, Plaintiffs conceded that their two state counts are preempted. Therefore, the only issue remaining before this Court is whether Defendant violated NLRA's prohibition against secondary boycotts by labor organizations aimed at neutral secondary employers. With regard to this federal claim, Plaintiffs contend that the terminations of their employment which ultimately led to CSC's demise, amounted to unlawful "threats, coercion, or restraint" by the Defendant with the object of forcing CSC to cease doing with Nexcare.

---

[5] *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S. Ct. 773 (1959).

### III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). According to *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

In deciding a motion for summary judgment under Rule 56, the Court must view the evidence in light most favorable to the nonmoving party. *Pack v. Damon Corp.*, 434 F.3d 810, 813 (6th Cir. 2006). However, the nonmoving party may not rely on mere allegations or denials; it must "cit[e] to particular parts of materials in the record" as establishing that one or more material facts are "genuinely disputed." FED. R. CIV. P. 56(c)(1). In addition, any supporting or opposing affidavits or declarations "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4). Lastly, "the mere existence of a scintilla of evidence that supports the nonmoving party's claim is insufficient to defeat summary judgment." *Pack*, 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted). The Court will apply the

above mentioned standards in deciding Defendant's motion for summary judgment in this case.

## IV.  DISCUSSION

The issue presented in this case is whether SEIU HCMI played such a role in CSC's termination of the three Plaintiffs (who constituted CSC's entire full-time staff) that it amounted to "threats, coercion, or restraint" of CSC with an object of forcing or requiring CSC to cease doing business with Nexcare in violation of NLRA § 8(b)(4)'s prohibition against secondary boycotts.

### A.    NLRA § 8(b)(4) and LMRA §303

Section 8(b)(4) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4), provides in pertinent part:

> It shall be an unfair labor practice for a labor organization or its agents—
>
> * * *
>
> (ii) to *threaten, coerce, or restrain* any person engaged in commerce or in an industry affecting commerce, where in either case an *object thereof* is—
>
> * * *
>
> (B) *forcing or requiring any person to cease using*, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, *or to cease doing business* with any other person . . . : *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

29 U.S.C. § 158(b)(4)(ii)(B) (emphasis added).

Section 303 of the Labor Management Relations Act, 29 U.S.C. § 187, provides a separate cause of action for federal district courts to address "damages suffered by

reason" of NLRA § 8(b)(4) violations.[6] *Shafer Redi-Mix, Inc. v. Chauffeurs, Teamsters & Helpers Local Union No. 7*, 643 F.3d 473, 478 (6th Cir. 2011) (internal quotation marks and alterations omitted). The standard of causation for a § 303 violation requires the defendant's conduct to "have 'materially contributed' to plaintiff's injury or was a 'substantial factor' in bringing it about." *Id.* (discussing the Sixth Circuit's adoption of the standard set forth in *Mead v. Retail Clerks Int'l Ass'n, Local Union No. 839*, 523 F.2d 1371, 1376 (9th Cir. 1975)). Accordingly, by applying the *Mead* Standard, the Plaintiffs "must prove that [their] injuries were proximately caused by the defendant's unlawful conduct." *Id.* at 479.

In order to prove an § 8(b)(4) violation, Plaintiffs must satisfy a two-part inquiry: (1) "whether the union threatened, coerced or restrained any person within the meaning of [§ 8(b)(4)(ii)]" ; and (2) "whether an object was to force any person to cease doing

---

[6]      Section 303 of the Labor Management Relations Act, 29 U.S.C. § 187, provides:

> (a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title.

> (b) Whoever shall be injured in his business or property by reason or any violation of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit.

29 U.S.C. § 187.

business with another [within the meaning of § 8(b)(4)(ii)(B)]." *T.H. Eifert, Inc. v. United Ass'n of Journeymen*, 422 F. Supp. 2d 818, 832 (W.D. Mich. 2006) (internal quotation marks omitted). Therefore, in order for a union to violate the statute, it "must engage in *unlawful activity* against a *neutral* employer for an *unlawful objective.*" *Id.* (internal quotation marks omitted, emphasis in original). Further, when determining "whether a union's conduct is statutorily prohibited, a court must consider the union's entire course of conduct." *Id.*

The Supreme Court has interpreted § 8(b)(4) to apply to only secondary boycotts which affect not "the employer who alone is a party to the dispute, but … some third party who has no concern in it." *Local 761, Int'l Union of Elec., Radio and Mach. Workers v. N.L.R.B.*, 366 U.S. 667, 672, 81 S. Ct. 1285, 1288 (1961) (internal quotation marks omitted). Accordingly, during "such a 'secondary boycott,' a 'union brings economic pressure to bear on a "primary employer" to do something the union wants . . . by inducing a "secondary employer" doing business with the primary employer to bring economic pressure on the primary employer.'" *Shafer Redi-Mix, Inc.*, 643 F.3d at 477.

As noted by the Supreme Court, the overarching legislative intent in enacting NLRA § 8(b)(4) was to "preserv[e] the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and [to] shield[] unoffending [neutral secondary] employers and others from pressures in controversies not their own." *N.L.R.B. v. Denver Bldg. & Constr. Trades Council*, 341 U.S. 675, 692, 71 S. Ct. 943, 953 (1951).

Plaintiffs here assert a violation of § 8(b)(4)(ii)(B) based on

11

> (1) Raleigh's command that Caref sever ties with Nexcare; (2) union president, Marge Faville's termination the employment of the Plaintiffs' employment, and (3) union president Faville's decision to discontinue union funding for the CSC after the CSC Board declared itself neutral as between the defendant union and Nexcare.

*See* Plaintiffs' Response Brief, p. 12. Taken together or separately, none of the these actions constitute an unfair labor practice under § 8(b)(4).

## B.   SEIU HCMI Did Not Threaten, Coerce, or Restrain CSC Within the Meaning of §   8(b)(4)(ii)

In order for a labor organization to violate § 8(b)(4)(ii)(B), it must first be determined that it threatened, coerced or restrained a neutral secondary employer within the meaning of § 8(b)(4)(ii). *T.H. Eifert, Inc.*, 422 F. Supp. 2d at 832. The Supreme Court has stated that by using the phrase "threaten, coerce, or restrain," Congress "was concerned with secondary picketing and strikes." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. and Constr. Trades Council*, 485 U.S. 568, 574, 108 S. Ct. 1392, 1397 (1988). As the Court noted in *DeBartolo Corp.*, the terms "threaten, coerce, or restrain" are "nonspecific, indeed vague, and should be interpreted with caution and not given a broad sweep." *DeBartolo Corp.*, 485 U.S. at 578 (internal quotation marks omitted). The Sixth Circuit, therefore, has interpreted "threats, coercion, and restraint" within the meaning of § 8(b)(4) to consist of appeals for, or actual, picketing, shutdowns, strikes, or causing the general "labor trouble" of a neutral secondary employer. *See Shafer Redi-Mix, Inc.*, 643 F.3d at 477. But, "more than mere persuasion is necessary" to show that a labor organization threatened, coerced, or restrained in violation of § 8(b)(4). *DeBartolo Corp.*, 485 U.S. at 578. In fact, "[g]eneral predictions of problems or trouble are not

alone sufficient to establish threats or coercion within the meaning of section 8(b)(4)(ii)"
because "mere reference to problems by the [u]nions may alone be found insufficient to
constitute coercion and . . . the trier of fact must find such general amorphous statements
coercive only when accompanied by actual or threatened picketing or walking off the job
or the like or preparations for same." *Shafer Redi Mix, Inc. v. Teamsters Local 7*, 2009
WL 2949278 at *2 (W.D. Mich. Sept. 10, 2009) (quoting *Brown & Root, Inc. v.
Louisiana State AFL-CIO,* 10 F.3d 316, 322 (5th Cir. 1994)) (internal quotation marks
omitted).

In *N.L.R.B. v. Servette, Inc.*, 377 U.S. 46, 84 S. Ct. 1098 (1964), the Supreme
Court held that the union asking neutral supermarket managers to discontinue handling
certain merchandise supplied by Servette, a wholesaler, and warning the managers that
the supermarkets will be handbilled asking the public not to purchase certain products
supplied by the wholesaler did not constitute threats, coercion, or restraint within the
authority of § 8(b)(4). *Id.* at 46, 47-48, 49-53. The Court reasoned that the union's actions
of asking supermarket managers to not handle certain products did not amount to a threat,
coercion, or restraint under § 8(b)(4) because the union merely asked the managers "to
make a managerial decision which . . . was within their authority to make." *Id.* at 51.

In *DeBartolo Corp.* the court held that a union's peacefully passing out of
handbills to mall customers urging them not to patronize the mall because some of the
mall's tenants employed non-union labor was not tantamount to threats, coercion, or
restraint and was not violative of § 8(b)(4). *DeBartolo Corp.*, 485 U.S. at 570-71, 574.
The court stated that more than "mere persuasion is necessary to prove a violation of §

13

8(b)(4)(ii)(B)," and in that case, the handbilling did not amount to more than persuasion because it was peaceful, there was no picketing or patrolling, and ultimately, there was no coercive effect on the neutral party. *Id.* at 575-76, 578.

The Sixth Circuit reaffirmed the holding of *DeBartolo* in *Storer Commc'ns, Inc. v. Nat'l Ass'n of Broadcast Employees and Technicians*, 854 F.2d 144 (6th Cir. 1988). In *Storer*, there was a dispute between a union representing broadcast workers and a television channel. *Id.* at 145. The union attempted to influence neutral secondary parties -- companies that advertised on the television channel -- by distributing handbills to the business owners and their customers urging them to stop doing business with the television station *Id.* In addition, the union called some of the advertisers and advised them that if they did not pull their advertisements they would be subject to handbilling. *Id.* The court held that this conduct did not "constitute coercive, threatening, or restraining activity in violation of Section 8(b)(4)(ii)(B), even when handbilling urges a total consumer boycott of neutral secondary businesses." *Id.* at 147. The court emphasized that § 8(b)(4) was not violated because of the absence of any violence, picketing, or patrolling and because any loss in business to the television station would be a result of "mere persuasion." *Id.*

In *Shafer Redi-Mix, Inc.*, *supra*, the Sixth Circuit affirmed a district court's entry of summary judgment in favor of a union defendant because the plaintiff, a non-union contractor, could not prove a sufficient proximate causation between a union's statements over the phone about a possible labor disruption and the plaintiff's dismissal as a contractor. *Shafer*, 643 F.3d at 479-81. Shafer, a non-union concrete supplier, was hired

14

as a sub-contractor by Clark, the general contractor. *Id.* at 474-76. During a telephone conversation between the general contractor and the two unions involved, one of the union representatives indicated that if "Shafer remained on the project, there could be a labor disruption," such as picketing. *Id.* at 475. Although the court stated that a "threat of a labor trouble is sufficient" to violate § 8(b)(4), it found that the evidence did not support the inference that Shafer was dropped as a sub-contractor because of the unions' threat to picket. *Id.* at 477, 480. Therefore, not only was the threat not a substantial factor in bringing about plaintiff's injuries, but also, there was no proximate causation between the threat and Shafer being dropped as a sub-contractor. *Id.* at 480. The court reasoned that the absence of a proximate causation was supported by evidence that the general contractor was in the process of terminating Shafer's contract before the threat was even made. *Id.*

### 1.    Raleigh's Command to Sever Ties With Nexcare

Viewing the facts in this case in light most favorable to the Plaintiffs, the Court finds that the Defendant union's statements to CSC and its employees did not rise to the level of a threat, coercion, or restraint and its actions did not have the object of forcing CSC to cease doing business with Nexcare.

As indicated above, on April 29, 2010, Mark Raleigh, SEIU HCMI's Chief of Staff, met with Anita Caref of CSC and allegedly "ordered" her to "sever ties with Nexcare."  Plaintiffs assert that Caref interpreted this statement as a "command." The interaction between Raleigh and Caref is similar to the one between the union and supermarket managers in *Servette*. In *Servette*, the union asked supermarket managers to

15

support the strike by ceasing handling certain products distributed by a wholesaler. *Servette*, 377 U.S. at 47. The Supreme Court held that the union's actions of asking supermarket managers to not handle certain products did not amount to a threat, coercion, or restraint under § 8(b)(4) because the union just wanted the managers "to make a managerial decision which . . . was within their authority to make." *Id.* at 51. Just as in *Servette*, here, the union, through Raleigh, asked CSC, through Caref, to stop dealing with Nexcare. Raleigh was merely asking Caref to make a managerial decision which was within Caref's authority make. In fact, Caref refused to comply with Raleigh's "command."  Further, CSC's Board exercised its own managerial discretion to pass a neutrality resolution so as not to get involved in the dispute between SEIU HCMI and Nexcare. Just as in *Servette*, Raleigh's conversation with Caref did not amount to a threat, coercion, or restraint of CSC with regard to its dealings with Nexcare.

As noted in *DeBartolo*, the Supreme Court stated that more than "mere persuasion is necessary to prove a violation of § 8(b)(4)(ii)(B)," and in that case, the handbilling did not amount to more than persuasion because it was peaceful, there was no picketing or patrolling, and ultimately, there was no coercive effect on the neutral party. *Id.* at 570-71, 574. Thus, a violation of § 8(b)(4) is more likely if there is evidence of actual or threats of picketing or patrolling.   Here, however, the evidence does not support a finding that there was anything more than "mere persuasion" on behalf of SEIU HCMI. Raleigh's statements to Caref were not followed up by SEIU HCMI's actions -- there were no further conversations or threats about SEIU HCMI picketing, patrolling, or striking CSC. This was an isolated conversation between Raleigh and Caref, after which no further

action was taken by the union. This reasoning is further supported by *Storer* where the court emphasized that the absence of threats or actual violence, picketing, or patrolling on behalf of the union is an indication that the union's actions or statements were mere persuasion and not § 8(b)(4) violations. *Storer Commc'ns, Inc.*, 854 F.2d at 147. In this case, evidence does not support a finding that SEIU HCMI threatened CSC with violence, picketing, or patrolling if CSC did not comply with the union's command to sever ties with Nexcare.

Lastly, in *Shafer Redi-Mix, Inc.* the court stated that a "threat of a labor trouble is sufficient" to violate § 8(b)(4). *Shafer*, 643 F.3d at 477. However, the court found that there was no evidence to support the inference that a threat of a labor disruption over the phone was a substantial factor or proximately caused the discharge of the non-union sub-contractor. *Id.* 477, 480. The court held that the intent and reason behind the termination of the non-union sub-contractor was formed before the threat was even made. *Id.* at 480. Thus, by adopting the *Mead* standard of causation, plaintiff must prove that defendant's conduct must "have 'materially contributed' to plaintiff's injury or was a 'substantial factor' in bringing it about." *Id.* at 478.

By applying the *Mead* standard as it was adopted in *Shafer Redi-Mix*, evidence of record does not support an inference for a reasonable trier of fact to find that a conversation between Raleigh and Caref that took place on April 29 resulted in Plaintiffs' termination on June 23 that ultimately led to a secondary boycott of Nexcare. The connection between the conversation and the terminations is too remote to show that the union's conduct materially contributed to Plaintiffs' injury or was a substantial factor in

17

bringing it about.  In Raleigh's conversation with Caref, the topic of Plaintiffs' continued employment or CSC's future did not arise.

In addition, there is no evidence that any agent or representative of SEIU HCMI ever spoke with the three Plaintiffs about CSC's interaction with Nexcare. Therefore, even if Raleigh's command to Caref to sever all ties with Nexcare was a threat under § 8(b)(4), it would still fail to pass the *Mead* standard because the threat did not proximately cause, nor was it a substantial factor in Plaintiffs' terminations or the alleged secondary boycott of Nexcare by CSC. The threat was merely for CSC to cease doing business with Nexcare and not to terminate Plaintiffs' employment.

Further, as stated by the district court in *Shafer Redi Mix, Inc.*, 2009 WL 2949278 at *2, "[g]eneral predictions of problems or trouble are not alone sufficient to establish threats or coercion within the meaning of section 8(b)(4)(ii) . . . [and] the trier of fact must find such general amorphous statements coercive only when accompanied by actual or threatened picketing or walking off the job or the like or preparations for same." *Id.* (quoting *Brown & Root, Inc. v. Louisiana State AFL-CIO,* 10 F.3d 316, 322 (5th Cir. 1994)) (internal quotation marks omitted). In this case, the Defendant union's actions did not rise beyond a "general amorphous statements" because they were not accompanied by "actual or threatened picketing or walking off the job" by SEIU HCMI members at CSC. *Id.*

Accordingly, even when examining the facts in light most favorable to the Plaintiffs and treating the conversation between Raleigh and Caref as an order or a command on behalf of the union, SEIU HCMI did not threaten, coerce, or restrain CSC

because the command was subject to Caref's and CSC's managerial discretions, which they both exercised. The command, without referring to strikes, picketing, or patrolling, was nothing more than mere persuasion, a general prediction, or an amorphous statement; and the command was not a proximate causation or a substantial factor in bringing about Plaintiffs' termination.

For the reasons stated above, the Defendant union's statements and actions in connection with CSC and its employees, did not rise to the level of a threat, coercion, or restraint within the meaning of § 8(b)(4)(ii). Thus, Plaintiffs failed to prove the first prong of the § 8(b)(4) analysis. Moreover, even if the Plaintiffs could show that Defendant's actions constituted a threat, coercion, or restraint under § 8(b)(4)(ii), the *Mead* standard still has not been satisfied because Plaintiffs have failed to show that Defendant's misconduct was a substantial factor in proximately causing and materially bringing about the Plaintiffs' injuries.

## C.   SEIU HCMI's Actions Did Not Have the Requisite Object or Purpose

The second prong of the § 8(b)(4) analysis is that any threat, coercion, or restraint against a neutral secondary employer must be carried out with an object or purpose of "forcing or requiring any person to cease doing business with any other person." NLRB § 8(b)(4)(ii)(B). The Sixth Circuit interpreted the second prong of the statute:

> Union conduct violates section 8(b)(4) if *any* object of that activity is to exert *improper* influence on secondary or neutral parties . . . The ultimate inquiry focuses on the *intent* of the union, not the effects of its actions. Accordingly, it is clear that union conduct violates § 8(b)(4) and provides an action for damages under § 303 when the union acts with the *intent and object* of causing a cessation of or interference with business between a neutral party and the primary employer.

*Carruthers Ready-Mix, Inc. v. Cement Masons Local Union No. 520*, 779 F.2d 320, 323 (6th Cir. 1985) (internal quotation marks and alterations omitted) (emphasis added).

As stated in the previous section, Plaintiffs failed to satisfy the first prong of the analysis because the Defendant did not threaten, coerce, or restrain CSC within the meaning of § 8(b)(4)(ii). Therefore, even if this court was to find that the Defendant did have the object or intent of disrupting the business relationship between CSC and Nexcare as required by § 8(b)(4)(ii)(B), the Defendant's conduct would still not be violative of § 8(b)(4) because its actions are not "improper" under the first prong of the analysis.

Plaintiffs contend that it is the combination of Raleigh's conversation with Caref, along with Faville's termination of Plaintiffs and Faville's decision to discontinue union funding for CSC, taken together, established Defendant's clear purpose to disrupt CSC's business and interference with CSC's relationship with Nexcare.

### 1.    CSC's Termination of Plaintiffs

Plaintiffs assert that Faville's decision to terminate Plaintiffs had the purpose of threatening, coercing, or restraining CSC to cease doing business with Nexcare in violation of § 8(b)(4). As indicated above, Caref resigned on May 27 as CSC's Executive Director for reasons unrelated to this case and Faville, the president of SEIU HCMI, assumed the role of CSC's president as of that day. As the CSC president, but not as the SEIU HCMI president, Faville had authority and discretion to terminate employees

20

without Board approval. *See* Defendant's Exhibit 1, Bylaws of the Cassie Stern Center, Section 4.5. [7]

The purpose of enacting § 8(b)(4) was to shield "unoffending [neutral secondary] employers and others from pressures in controversies not their own." *Denver Bldg. & Const. Trades Council*, *supra*, 341 U.S. at 692, 71 S. Ct. at 953. In this case, Plaintiffs contend that § 8(b)(4) is meant to shield CSC and the Plaintiffs from the controversy between SEIU HCMI and Nexcare. However, § 8(b)(4) was never designed to protect Plaintiffs from being terminated by their own employer, as was the case here.

On June 22, 2010 CSC held its Board meeting at which time it passed a resolution to remain neutral in a dispute between SEIU HCMI and Nexcare. The following day, at Faville's request, Lobaito looked into CSC's payroll and discovered that it did not have enough resources to pay its employees - the Plaintiffs. Consequently, Faville, acting as the CSC president, terminated the three Plaintiffs because CSC could no longer pay them. At the subsequent CSC Board Meeting that occurred on August 30, 2010, when Faville

---

[7] CSC's Bylaws, Section 4.5 states in part:

> Except as otherwise expressly law, by the Articles of Incorporation, or these bylaws, the President shall conduct and administer the operation of those powers and duties which normally pertain to the office of President, including but not limited to, the authority . . . hire (at reasonable compensation) and *discharge employees*, if any. (emphasis added).

Defendant's Exhibit 1.

Section 4.6 which addresses the powers of Executive Director - the position from which Caref actually resigned - has an identical clause as in Section 4.5. *Id.*

21

was asked the reason for Plaintiffs' terminations, she responded that CSC did not have the funds to cover CSC's payroll.

If Faville did not have the authority as the CSC president to fire the Plaintiffs then the CSC Board could have overruled her decision. Ultimately, Plaintiffs' termination by Faville cannot be an § 8(b)(4) violation because they were fired not by the Defendant union, but by CSC, their own employer. Alternatively, if Faville had the requisite authority and terminated Plaintiffs in her capacity as president of SEIU HCMI, and not as the CSC president, then CSC is no longer a neutral secondary employer, but an extension of SEIU HCMI involved in the primary dispute with Nexcare. In this scenario, § 8(b)(4) would be equally inapplicable because the statute does not protect employees from their own employer.

Thus, Faville's decision as the CSC president to terminate the Plaintiffs did not constitute a threat, coercion, or restraint, and was, therefore, not an improper or an unlawful conduct under the statute.

There is also no evidence that by CSC terminating the Plaintiffs, the Defendant union had the requisite intent or object of ensuring a disruption of the business relationship between CSC and Nexcare, and thus, effectuating a secondary boycott. After termination of the Plaintiffs' employment, CSC continued to exist, albeit without a full-time staff, until its dissolution on October 10, 2010. There is no evidence that after the Plaintiffs' termination, SEIU HCMI impeded CSC's relationship with Nexcare. In addition, when Faville replaced Caref on May 27 as CSC's president, she took no action to disrupt CSC's relationship with Nexcare, and in fact, despite Faville's objections, the

CSC Board continued its independent functioning by passing a neutrality resolution on June 22.

It is not an § 8(b)(4) violation for an employer to fire its own full-time staff. Consequently, there is no evidence for a reasonable trier of fact to find that the substantial reason for Plaintiffs' terminations was SEIU HCMI's threatening or restraining CSC from doing business with Nexcare.

### 2.    <u>SEIU HCMI's Discontinuation of Funding CSC's Payroll</u>

Plaintiffs' last argument is that SEIU HCMI's decision, led by Faville, to stop short-term funding of CSC's payroll had the object and purpose of threatening, coercing, or restraining CSC from doing business with Nexcare.

During the June 22, 2010 CSC Board Meeting when the Board passed a neutrality resolution, it was revealed that CSC had funding issues, however. The following day, on June 23, 2010, at Faville's request, Lobaito looked into CSC's short-term funding and discovered that CSC did not have enough money to cover payroll. Plaintiffs contend that in the past whenever CSC would be between grants and could not cover payroll, SEIU HCMI would transfer funds to keep CSC functioning until grant money would arrive, but that, in this instance, Faville, in her capacity as the SEIU HCMI president, refused to transfer money to CSC to cover the Plaintiffs' payroll. Plaintiffs argue that Faville's refusal to transfer money from SEIU HCMI to CSC had the object of terminating CSC's relationship with Nexcare, especially in light of the fact that CSC was awaiting to receive grant money to continue its operations.

As noted above, § 8(b)(4) is designed to protect neutral parties, such as CSC, from a union's threats, coercion, or restraint in the form of violence, picketing, patrolling, or striking. *Storer Commc'ns, Inc.*, 854 F.2d at 147. Here, however, Faville's refusal to fund CSC's payroll is not an § 8(b)(4) violation because SEIU HCMI was not under any statutory or contractual obligation to fund CSC's payroll, and Faville, as the SEIU HCMI president, had the complete discretion and authority to cease CSC's funding for any reason.

Even if Faville's decision to stop covering CSC's payroll was tantamount to a threat, coercion, or restraint under the statute, the record does not support Plaintiffs' contention that such a decision had the object of ensuring that CSC would cease doing business with Nexcare because a union is under no obligation to fund secondary employers.

Thus, Plaintiffs failed to meet the standards of § 8(b)(4)(ii)(B) - the second prong of the § 8(b)(4) analysis. Evidence does not support the conclusion that a reasonable trier of fact could determine that Plaintiffs' termination by their own employer along with SEIU HCMI's decision to withhold funds from CSC constituted a threat, coercion, or restraint by the Defendant union with the object of ceasing the business relationship between CSC and Nexcare. Additionally, even if Plaintiffs could show that Defendant's action had the requisite object of ceasing the business relationship within the meaning of § (8)(b)(4)(ii)(B), Plaintiffs' argument would still fail because they did not satisfy § 8(b)(4)(ii) -- the first prong of the § 8(b)(4) test -- as Defendant's actions were not "improper" or "unlawful" within the meaning of the statute.

Ultimately, Plaintiffs failed to show that the union engaged in an "unlawful activity against a neutral employer for an unlawful objective," as is required by the statute. *T.H. Eifert, Inc.*, 422 F. Supp. 2d at 832. (internal quotation marks omitted).

## D.   The Cases Relied Upon By Plaintiffs Are Not Persuasive

In support of their arguments Plaintiffs rely heavily on *Wells v. Int'l Union of Operating Eng'rs*, 303 F.2d 73 (6th Cir. 1962) and *United Brotherhood of Carpenters and Joiners of America*, 355 NLRB No. 159 (August 27, 2010). However, the two cases are not applicable to this case and, hence, not persuasive.

In *Wells* the defendant union picketed the work site where plaintiff was performing concrete work and, as a result of the picketing, all work and deliveries of concrete by Transit-Mix Company, a secondary neutral party, were halted. *Wells*, 303 F.2d at 74. The union picketed with the purpose of replacing plaintiff's union as their bargaining agent. *Id.* One of the defendant union's representatives happened to be a union steward with the secondary neutral employer. *Id.* The defendant union contacted this union steward and advised him not to cross the picket line. *Id.* Ultimately the court held that the union's picketing were "secondary in nature and were engaged in for the purpose of inducing" the neutral secondary employer not to deliver concrete to the plaintiff. *Id.* at 75.

Plaintiffs primarily rely on *Wells* because the court stated in *dictum* that the "fact that only a single employee was contacted would not prevent the existence of the requisite inducement of the employees as this employee was the union steward who could reasonably have been expected to transmit Union instructions to his fellow employees"

with the purpose of ensuring that his fellow employees would not cross the picket lines and concrete deliveries would be disrupted. *Id.* at 74. Plaintiffs posit that, because in *Wells* the court found that the defendant union's instructions to a single employee of a neutral secondary party induced the secondary party to cease doing business with the primary employer, in this case, Raleigh's statements to Caref also amount to a violation.

Plaintiffs' reliance on *Wells* is misplaced. First, the *Wells* court found that the defendant union *induced* (not threatened, coerced, or restrained) *neutral employees of the secondary employer* to stop delivering concrete to the primary work site. Such an inducement is in violation of § 8(b)(4)(i), a separate section of the NLRA, which prohibits inducement or encouragement of an *employee* of a neutral secondary employer to cease doing business with the primary employer.[8] Here, however, Plaintiffs allege that SEIU HCMI threatened, coerced, or restrained CSC, the *employer*, to cease doing business with Nexcare, which is prohibited by § 8(b)(4)*(ii)*, not by § 8(b)(4)*(i)*. Thus,

---

[8]  § 8(b)(4)(i) states:

> It shall be an unfair labor practice for a labor organization or its agents--(4) (i) to engage in, or to *induce* or *encourage any individual employed* by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal *in the course of his employment* . . .

29 U.S.C. 158(b)(4)(i) (emphasis added).

Whereas § 8(b)(4)(ii) states: "It shall be an unfair labor practice for a labor organization or its agents--(4) (ii) to *threaten, coerce, or restrain any person engaged in commerce* or in an industry affecting commerce . . ." 29 U.S.C. 158(b)(4)(ii) (emphasis added).

Plaintiffs' reliance on *Wells* is misplaced because the *Wells* court found that the union violated § 8(b)(4)(i), not § 8(b)(4)(ii).

Second, even if *Wells* was referring to the same section of the statute, the facts of the case distinguish it from this case. In *Wells* the main issue was whether the defendant union's *picketing* of the job site constituted a proscribed secondary boycott. *Wells*, 303 F.2d at 74. However, the issue in this case is whether the Defendant union's statements to a neutral secondary employer amounted to a proscribed secondary boycott. As stated above, Raleigh's statements to Caref did not amount to a threat, coercion, or restraint because there was no threat of or actual picketing, patrolling, strikes, or violence. In *Wells*, the defendant union's picketing and its statements to the union steward resulted not only in work stoppage, but also in a disruption of a business relationship between a primary and a secondary employer. Here, Raleigh's statements to Caref resulted in CSC exercising its managerial discretion by passing a neutrality resolution. SEIU HCMI did not picket, strike, patrol or threaten any CSC employee.

Lastly, in *Wells*, the defendant union instructed a single union employee, a union steward, to respect the picket line. The court found that such contact between the defendant union and employees of a neutral secondary employer was sufficient to find the requisite inducement. In this case, however, Caref was not SEIU HCMI's steward with CSC and there was no picket line or strike for Caref to respect. Moreover, neither Raleigh, Faville, nor any other SEIU HCMI member ever had any conversations with the Plaintiffs themselves to induce them to cease dealing with Nexcare.

27

Therefore, *Wells* is inapplicable not only because it examines the wrong section of the § 8(b)(4) analysis but also because the facts of the case are clearly distinguishable from the case at hand.

Plaintiffs also rely on *United Brotherhood of Carpenters and Joiners of America*, 355 NLRB No. 159 (Aug. 27, 2010) to elucidate the standard for non-picketing conduct directed at neutral employees. In reliance on this NLRB decision, Plaintiffs assert that the standard to find certain union conduct coercive and in violation of § 8(b)(4) is whether the defendant union's conduct "directly caused, or could reasonably be expected to directly cause, disruption of the secondary's operations." *See* Plaintiffs' Response Brief, p. 1 (quoting *United Brotherhood of Carpenters and Joiners of America*, 355 NLRB No. 159 at 12 (Aug. 27, 2010)).

However, the Sixth Circuit has held that "decisions of the National Labor Relations Board are not controlling in damages actions seeking to enforce § 158(b)(4)." *Shafer Redi-Mix, Inc.*, *supra*, 643 F.3d at 478. ("We do not regard the decisions of the Board as controlling on us in damage actions under Section 303" (quoting *Riverton Coal Co. v. United Mine Workers of America*, 453 F.2d 1035, 1042 (6th Cir. 1972) (citing *Int'l Longshoremen's & Warehousemen's Union v. Juneau Spruce Corp.*, 342 U.S. 237, 72 S. Ct. 235 (1952))).

For these reasons, the Court finds that Plaintiffs' arguments are not supported by persuasive or controlling precedent.

# V.  <u>CONCLUSION</u>

Analyzing the facts in light most favorable to the Plaintiffs, this court finds that there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(1). Plaintiffs failed to satisfy either of the prongs of the § 8(b)(4) analysis. SEIU HCMI's statements to CSC do not amount to threats, coercion, or restraint within the meaning of § 8(b)(4)(ii). SEIU HCMI never even discussed with the three Plaintiffs their work with Nexcare. Neither CSC's decision to terminate the three Plaintiffs for financial reasons or SEIU HCMI's decision to discontinue funding CSC constituted the requisite object or intent on behalf of SEIU HCMI to threaten, coerce, or restrain CSC to force it into ceasing its business relationship with Nexcare within the meaning of § 8(b)(4)(ii)(B). Lastly, Plaintiffs also failed to satisfy the *Mead* causation standard that is necessary to prove a § 303 claim.

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment **[Dkt. # 19]** is GRANTED and Plaintiffs' Complaint is DISMISSED, with prejudice.


Dated:  March 29, 2013                     s/Gerald E. Rosen_____
                                           GERALD E. ROSEN
                                           CHIEF, U.S. DISTRICT COURT


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, March 29, 2013, by electronic and/or ordinary mail.

                                           s/Julie Owens_____
                                           Case Manager, (313) 234-5135

29